IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LYNETTE COSBY, | ) |
|     Plaintiff, | ) No. 16 C 11504 |
| v. | ) Magistrate Judge M. David Weisman |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lynette Cosby appeals the Commissioner's decision denying her application for Social Security benefits. For the reasons set forth below, the Court reverses the Commissioner's decision and remands the case for further proceedings.

## Background

Plaintiff filed an application for benefits on October 17, 2012. (R. 116.) Her application was denied initially on March 29, 2013, and again on reconsideration on August 29, 2013. (R. 116, 135.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 5, 2014. (R. 41-115.) On April 21, 2015, the ALJ issued a decision denying plaintiff's application. (R. 26-36.) The Appeals Council denied review (R. 1-4), leaving the ALJ's decision as the final decision of the Commissioner. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

---

[1] On January 23, 2017, Nancy A. Berryhill succeeded Carolyn W. Colvin as Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (last visited Sept. 25, 2017). Accordingly, the Court substitutes Berryhill for Colvin pursuant to Federal Rule of Civil Procedure 25(d).

**Discussion**

The Court reviews the ALJ's decision deferentially, affirming if it is supported by "substantial evidence in the record," *i.e.*, "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *White v. Sullivan*, 965 F.2d 133, 136 (7th Cir. 1992) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the "decision lacks evidentiary support." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider: (1) whether the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether the claimant's impairment meets or equals any listed impairment; (4) if not, whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether he is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). The claimant bears the burden of proof at steps one through four, and if that burden is met, the burden shifts at step five to the Commissioner to provide evidence that the claimant is capable of performing work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1560(c)(2).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since her amended disability onset date. (R. 28.) At step two, the ALJ found that plaintiff had the severe impairments of "degenerative disc disease, peripheral neuropathy[2] and adrenal mass." (*Id.*) At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (R. 29.) At step four, the ALJ found that plaintiff could not perform her past relevant work, but had the RFC to perform light work with additional restrictions, and thus she was not disabled. (R. 29, 35-36.)

Plaintiff contends that the ALJ improperly evaluated her symptoms. The Commissioner has issued new guidance for symptom evaluation, SSR 16-3p, which supersedes SSR 96-7p, the guidance used by the ALJ. Though SSR 16-3p was issued after the ALJ's decision, it is appropriate to apply it here because it is a clarification of, not a change to, existing law, *see Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999) (stating that courts give "great weight" to an agency's expressed intent to clarify a regulation), and it requires an ALJ to consider the same factors in evaluating symptoms as did the prior guidance. *Compare* SSR 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016), *with* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

SSR 16-3p, like SSR 96-7p before it, requires an ALJ "to consider whether [a claimant has] an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce [her] symptoms, such as pain," and if so, to "evaluate the intensity and persistence of those symptoms to determine the extent to which [they] limit [the claimant's] ability to perform work-related activities." SSR 16-3p, 2016 WL 1119029, at *2.

---

[2] Neuropathy is a "pathological change in the peripheral nervous system." *Neuropathy*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

3

The ALJ determined that plaintiff's impairments caused her to "experience[] multiple significant limitations, but not . . . of the severity" she alleged because:

> The objective evidence reveals the presence of only mild degeneration of the spine and of mild peripheral neuropathy. The claimant's symptoms reportedly improved significantly after being started on medication and they responded well to steroid injections. . . . [S]he has not been recommended to undergo surgery or more aggressive treatment on her spine. In addition, her treating physician instructed her to increase her exercise level . . . . Furthermore, her symptoms are reportedly relieved through the use of alternative forms of treatment such as acupuncture and even drinking white chocolate mochas. Notes from physical examinations indicate that the claimant's condition improved after starting treatment, as she is able to walk with a normal gait, has full strength and range of motion of her upper and lower extremities and has full grip and dexterity bilaterally. In addition, it was noted during her most recent visit to her treating physician that her extremities and abdomen were without swelling or tenderness.

(R. 33) (citations omitted).

Plaintiff contends that none of her doctors characterized her neuropathy as mild, a point on which the record is unclear. The document the ALJ cites for that proposition says that plaintiff has mild dysfunction in certain nerves, which is indicative of small-fiber peripheral neuropathy, but not that the neuropathy itself is mild. (*See* R. at 33 (citing Ex. 3F/36 [R. 489] ("The findings provide evidence of mild cardiovagal,[3] adrenergic[4] and postganglionic[5] sympathetic[6] cholinergic[7] sudomotor[8] dysfunction as can be seen in neuropathies affecting autonomic[9] fibers."))); Jinny Tavee, MD, Lan Zhou, MD, *Small Fiber Neuropathy: A Burning Problem*, Cleveland Clinic Journal of Medicine (May 2009), *available at*,

---

[3] "Cardiovagal" means pertaining to the heart and vagus nerve. *Cardio*, *-vagal*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).
[4] "Adrenergic" refers to "the sympathetic nerve fibers that liberate norepinephrine at a synapse when a nerve impulse passes." *Adrenergic*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).
[5] "Postganglionic" means after or behind a "group of nerve cell bodies located outside the central nervous system." *Post*, *Ganglion*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).
[6] Sympathetic means "pertaining to the nervous system or one of its nerves." *Sympathetic*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).
[7] Cholinergic is "a term applied to the sympathetic and parasympathetic nerve fibers that liberate acetylcholine at a synapse when a nerve impulse passes." *Cholinergic*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).
[8] Sudomotor means "stimulating the sweat glands." *Sudomotor*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).
[9] Autonomic means "self-controlling." *Autonomic*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

http://www.mdedge.com/ccjm/article/95083/diabetes/small-fiber-neuropathy-burning-problem (last visited Sept. 25, 2017) ("Small fiber neuropathy is a disorder of the peripheral nerves that primarily or exclusively affects small somatic fibers, autonomic fibers, or both, resulting in sensory changes and autonomic dysfunction when both types are involved."). It may be that mild dysfunction is synonymous with mild neuropathy, but that is a medical conclusion the ALJ was not qualified to make. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("We have . . . insisted that an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.").

The same is true of the ALJ's reliance on the fact that plaintiff "has full strength and range of motion of her upper and lower extremities and has full grip and dexterity bilaterally." (R. 33.) The ALJ cites no medical evidence that suggests range of motion and grip strength are impacted by small-fiber neuropathy, *see* Jinny Tavee, MD, Lan Zhou, MD, *Small Fiber Neuropathy: A Burning Problem*, Cleveland Clinic Journal of Medicine (May 2009), http://www.mdedge.com/ccjm/article/95083/diabetes/small-fiber-neuropathy-burning-problem (last visited Sept. 25, 2017) (stating that "strength remains preserved throughout the course of th[is] disease"), so his assumption that they are is unfounded.

Moreover, the ALJ's assertion that plaintiff's pain improved with treatment is only partially true. On January 31, 2013, for example, plaintiff told the Mayo Clinic that "[the medications] Lyrica and tramadol ha[d] helped her pain syndrome" and "she [was] feeling the best she ha[d] in the last two years." [10] (R. 544.) Similarly, on July 22, 2013, a University of Chicago Medical Center doctor noted that plaintiff's "pain is currently controlled on high-dose

---

[10] The cause of plaintiff's pain was first diagnosed on November 2, 2012. (R. 467.)

lyrica and ultram." (R. 570.) There is ample evidence, however, from 2013-2015[11] that suggests the improvements were sporadic and short-lived. (*See* R. 778 (January 3, 2013 record from Premier Pain Specialists stating "[plaintiff] has trialed fentanyl patch, Celebrex, and Lyrica," had relief with Zanaflex "until recently," and rated her pain as a 9 out of 10); R. 499 (January 21, 2013 record from the Mayo Clinic stating that plaintiff "describes [her] pain as a 10/10," "has failed treatment with Lyrica, gabapentin, Cymbalta, Topamax" and was helped by Zanaflex but "it makes her too tired"); R. 521 (November 18, 2013 record from Franciscan Physician Network stating that plaintiff "complains of pain with just touching" and "[w]ith the stethoscope touching she seems to have pain"); R. 523 (December 31, 2013 record from Franciscan Physician Network saying that pain keeps plaintiff from sleeping); R. 524 (April 14, 2014 record from Franciscan Physician Network noting plaintiff's continued trouble sleeping); R. 781 (January 6, 2015 record from Premier Pain Specialists characterizing plaintiff's pain as "chronic," and stating that it has "acutely escalated over the past one month"); R. 783 (January 23, 2015 record from Premier Pain Specialists stating that plaintiff's "whole body has somewhat improved" but "she still rates her pain at 6 out of 10"); R. 789 (March 12, 2015 record from Premier Pain Specialists saying that plaintiff's pain is "8/10"); R. 792 (April 16, 2015 record from Premier Pain Specialists saying plaintiff "reports her pain had [sic] 11 out of 10 at worst").) It was error for the ALJ to dismiss this body of evidence supporting plaintiff's allegations of persistent pain in favor of a few reports of improvement. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("We have repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it. . . . The ALJ must confront the

---

[11]The ALJ's assertion that "[t]he record indicates that the claimant has not sought treatment for her 'severe' impairments since August 2014" (R. 32), is incorrect. (*See* R. 781-94 (medical records from 2015).)

evidence that does not support her conclusion and explain why that evidence was rejected."); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (per curiam) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.").

In evaluating plaintiff's symptoms, the ALJ was also required to but did not consider plaintiff's daily activities and the type, dosage, effectiveness, and side effects of the medication she takes for pain. *See* SSR 16-3p, 2016 WL 1119029, at *7; SSR 96-7p, 1996 WL 374186, at *3. Plaintiff and her husband both attested to the severe limitations on plaintiff's daily activities (*see* R. 244-49, 254-64 (stating that plaintiff does not drive, prepare meals, or do any house work; bathes and walks down stairs only with assistance; and leaves the house only once or twice per month)), which the ALJ addressed only cursorily. (*See* R. 33-34 (finding plaintiff to be "less than fully credible" and giving "some consideration and weight" to her husband's testimony without specially addressing their reports of her daily activities).) The ALJ also failed to acknowledge plaintiff's myriad attempts to find relief with medication and the side effects she suffered as a result. (*See, e.g.*, R. 499 (noting that plaintiff "has failed treatment with Lyrica, gabapentin, Cymbalta, Topamax" and that Zanaflex made her "too tired"); R. 778 (stating that plaintiff had tried Fentanyl, Celebrex, Lyrica, and Zanaflex, without sustained success); R. 261 (plaintiff reporting that Zanaflex caused her to have seizures, syncope, dizziness, and sleepiness); R. 333 (stating that plaintiff was using lidocaine patches and Vicodin for pain); R. 346 (noting that plaintiff had tried "numerous medications" including Lyrica, Neurontin, Lidoderm patch,

7

and Tylenol 3 "all of which did not help, alleviate the pain"); R. 350 (stating that plaintiff was trying Cymbalta); R. 354-56 (stating that plaintiff obtained some relief with acupuncture); R. 360 ("[Plaintiff] states Topomax made her feel worse.") R. 361 (noting that plaintiff's pain improved on Zanaflex and Topomax but she had a seizure and could not sleep); R. 363 (record stating that "[w]e have tried multiple [medications] which are now causing her nausea"); R. 370-73 (plaintiff reporting that Zanaflex caused "seizure-like" "involuntary twitching" and falls); R. 410 (noting that plaintiff had "[f]allen down several times"); R. 462-63 (noting that plaintiff stopped taking Topomax because of "the nausea, vomiting, and weight loss" and "will on occasion fall without warning and shake").) Similarly, the ALJ disregarded plaintiff's reported seizures because medical personnel had not witnessed one, and dismissed her fatigue because she was "alert and fully oriented" during mental status exams (R. 33), conclusions that do not follow logically from their respective premises. *See Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) ("The fact Moon did not have a headache at the time of [a particular doctor] visit is no reason to conclude anything about the frequency or severity of her migraines."); *Villano v. Astrue*, 556 F.3d at 562 ("The ALJ . . . [must] build a logical bridge between the evidence and his conclusion [on credibility].").

The ALJ also found it significant that no treating physician had opined that plaintiff is disabled. (R. 33-34.) But any such opinion would not have been controlling, as the determination of disability is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1). Moreover, the ALJ did not consider the fact that plaintiff had stopped working two years before she applied for benefits (R. 51), which may explain why her physicians did not address her ability to work.

The Commissioner attempts to defend the ALJ's findings by filing a strongly-crafted memorandum of law that includes a detailed and robust explanation of reasons why the ALJ's findings are supported by the record. However, our concern is that the ALJ's opinion, as currently articulated, fails to consider contrary medical evidence, and draws conclusions as to plaintiff's credibility based on the ALJ's misunderstanding as to the medical underpinnings of plaintiff's claimed disability. After consideration of the issues raised here, and further elaboration of his reasoning, the ALJ may reach a conclusion similar to the one he initially reached. But we are obligated to remand the case so the ALJ can address the deficiencies identified herein.

## Conclusion

For the reasons set forth above, the Court denies the Commissioner's motion for summary judgment [16], reverses the Commissioner's decision, and remands this case for further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.

**SO ORDERED.**                                      **ENTERED:** September 25, 2017

_____
**M. David Weisman**
**United States Magistrate Judge**